Nelson H. Rittenhouse and Virginia M. Rittenhouse v. Commissioner.
Rittenhouse v. Commissioner
Docket No. 91695.
United States Tax Court
T.C. Memo 1965-245; 1965 Tax Ct. Memo LEXIS 85; 24 T.C.M. (CCH) 1255; T.C.M. (RIA) 65245; September 13, 1965
*85 1. As regards each of the taxable years 1950 and 1951, petitioner Nelson H. Rittenhouse was not the owner of a steam heating plant known as Kable Square Heating Plant, which was then operated under his direction in supplying heat to buildings located on the former campus of Mount Morris College, in Mount Morris, Illinois. None of the net income, if any, from the operation of said heating plant is chargeable to said petitioner for either of said years. 2. As regards each of the taxable years 1950 through 1952, the correct net income that petitioner derived from a small trucking business that he operated as a sole proprietor (Kable Brothers Transport) is determined. 3. As regard each of the years 1950 through 1952, no part of any deficiency is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. 4. As regards the taxable years 1950 and 1951, the joint return filed by petitioner and his wife for each of the years is not false or fraudulent with intent to evade tax; and assessment and collection of any deficiencies for these years are barred by the statute of limitations. Assessment and collection of a deficiency for 1952 is not barred, *86 however, since petitioners filed waivers extending the time for assessment for that year to a date beyond that on which the deficiency notice was mailed. Nelson H. Rittenhouse, pro se. Donald J. Forman, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in the income taxes of petitioners, and additions to tax for fraud under section 293(b) of the 1939 Code, for calendar years and in amounts as follows: Calendar
Addition to tax
year
Deficiency
under Sec. 293(b)
1950
$22,902.60
$11,451.30
1951
22,320.80
11,160.40
1952
14,014.58
7,007.29
1953
479.08
1954
1,358.04
The respondent, both in a statement made at the trial herein and *87 also in the First Supplemental Stipulation of Facts, has now conceded that there is no deficiency in the income tax of the petitioners for either of their taxable years 1953 and 1954. Also, the respondent, by amendment to his answer herein, has asserted claim to an increased deficiency for the year 1952, and claim to a proportionately increased addition to tax for said year, both based on claimed additional gross income for 1952. The petitioners, Nelson and Virginia Rittenhouse, are husband and wife, residing in Mount Morris, Illinois. They filed a joint Federal income tax return for each of the calendar years 1950, 1951 and 1952 (being the only remaining years here involved) with the collector or director of internal revenue at Chicago. The wife, Virginia, is a party herein solely because she joined in filing said returns; and consequently the term "petitioner" as used hereinafter, will have reference to the husband-petitioner, Nelson Rittenhouse. The issues presented for decision are: (1) As regards each of the years 1950 and 1951, was petitioner the owner of a steam heating plant known as Kable Square Heating Plant, which was then operated under his direction in supplying *88 heat to buildings located on the former campus of Mount Morris College, in Mount Morris, Illinois? The answer to this question will be determinative of whether the net income, if any, from the operation of said heating plant for said years, is chargeable to said petitioner. (2) As regards each of the years 1950 through 1952, what was the correct amount of net income that petitioner derived from a trucking business that he operated as a sole proprietor under the name of Kable Brothers Transport? (3) As regards each of the years 1950 through 1952, was any part of any deficiency for any of said years due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code? (4) As regards each of the years 1950 and 1951, are assessment and collection of any deficiency barred by the statute of limitations? Some of the facts have been stipulated; and they are hereinafter so found. The stipulations of facts and all exhibits therein identified, are incorporated herein by reference. Issue 1 - Re Kable Square Heating Plant Findings of Fact Petitioner was born at Elgin, Illinois, in 1908; and about 10 years thereafter he moved with his parents to Mount Morris, *89 Illinois (a community of about 2,500 people during the taxable years involved). Following graduation from high school, he enrolled at Mount Morris College, from which he graduated with a B.S. or a B.A. degree in or about 1930. In 1927, petitioner was licensed to preach the Christian gospel by a Protestant denomination known as the Church of the Brethren. Thereafter, in about 1930, he was ordained as a minister of said denomination. In about 1933 or 1934, he became the pastor of a small rural church of that denomination, located near Mount Morris, Illinois, and known as the Pine Creek Church of the Brethern (hereinafter called the "Pine Creek church"); and thereafter and throughout the taxable years, he continued to serve said rural church as its pastor. He was a so-called "free minister"; and as such, he received no salary or other monetary compensation for his pastoral services. His principal means of livelihood was the operation of a small trucking company in Mount Morris, known as Kable Brothers Transport, which is hereinafter more fully described in our Findings of Fact regarding Issue 2. For many years prior to 1931, the Church of the Brethern denomination operated a small *90 educational institution in Mount Morris, known as Mount Morris College. In 1931, said denomination closed this college, due to adverse financial circumstances. At that time, Kable Brothers Company which is a rather large printing company located in Mount Morris, took over all of the college's physical assets - including the campus, classroom buildings, dormitories, administration buildings, and steam heating plant - and also assumed all of the college's outstanding debts and financial obligations. Thereafter Kable Brothers Company adapted certain of said college buildings to its own use, and disposed of most of the other former college properties to business organizations in Mount Morris, to the Village of Mount Morris, and to various individuals. Until 1947, Kable Brothers Company continued to retain the former college's central heating plant, and to furnish steam therefrom, not only for the college buildings which it retained for its own use, but also for the occupants of the college buildings that it had sold. The heating plant, however, was old, inefficient, and in a largely depreciated condition; and Kable Brothers Company made known that it would be willing to sell the plant, *91 including the small building in which the office and boilers were located, for a total price of only about $8,000. Sometime in the early 1940's the Annual Conference of the Church of the Brethren [1] created a National Men's Work Organization, for the purpose of interesting laymen in organizing and pursuing projects that would generate funds for the needs of local churches. Thereafter in about 1945, the petitioner, who as pastor of the Pine Creek church was familiar with the objectives of this Men's Work Organization, learned of the desire of Kable Brothers Company to dispose of said former college's central heating plant; and he then conceived the idea that it might be desirable for his local church to acquire this heating plant, so that any profits that might be derived from operating the same, could be devoted to certain needs and contemplated projects of his church. He believed, for example, that if profits could be so realized, a portion of the same could be used for *92 purposes directly associated with the Pine Creek church - such as fixing up the parsonage and making needed improvements to the church buildings; and also that the small building which housed the heating plant's office and boilers could provide quarters in Mount Morris for a contemplated project (then under consideration) which was the widespread distribution of religious books and literature for children. During the latter part of 1945 and continuing throughout 1946 and into 1947, petitioner had several conferences regarding the contemplated plan for acquisition of the heating plant properties, with two members of the board of trustees of the Pine Creek church and also with a minister of the Church of the Brethren who was overseeing the above-mentioned Men's Work Organization of that denomination for Northern Illinois and Wisconsin. During these conferences it was recognized that the Pine Creek church itself did not have sufficient funds available with which to buy the heating plant (even at the price of about $8,000) and also with which thereafter to operate the same. Petitioner thereupon suggested a solution to the problem - that he personally would advance for the benefit of *93 the Pine Creek church, the funds necessary for acquisition of the heating plant properties; that he personally would assume the duties of managing the heating plant operations, without charge to the church; and that, in handling such management, he should be permitted to use without rental charge to him, one of the rooms in the heating plant building as an office for his trucking business. The end result of said conferences was that, despite misgivings on the part of one of the church trustees that the contemplated operation of the heating plant by the church might not prove financially successful, the foregoing suggested arrangement was approved. Thereafter, on June 2, 1947, petitioner acting through Luke Stuart, who was a real estate broker and also one of the directors of Kable Brothers Company, advanced funds in the amount of $8,000; and the heating plant properties were acquired from the Kable Brothers Company for the benefit of the Pine Creek church. The mechanics of the transaction were as follows. Petitioner and certain other members of Pine Creek church group did not want it to be publicly known that the church was acquiring these properties; and to accomplish this, it was *94 arranged for the deed of the properties to run from Kable Brothers Company to Luke Stuart and his wife. This deed was issued on June 2, 1947, and filed in the county recorders office the same day. The next day Stuart and his wife signed a deed covering the heating plant properties, running to petitioner. This second deed was, pursuant to petitioners suggestion, retained by Stuart. However, about 5 months later, Stuart insisted, because of possible complications to his estate, on turning the deed over to petitioner; and this was done some time in November 1947. Petitioner did not record the deed immediately; rather, he held the same until March 1955 (over 3 years after the heating plant was closed down in 1951), when he recorded the deed in the county recorder's office. In September 1947, a bank account in the name of "Kable Square Heating Plant by N. H. Rittenhouse, was opened in the First National Bank of Freeport, Illinois, which was the town where the above-mentioned Luke Stuart resided. Extensive maintenance and repair costs were entailed almost immediately after the churchs acquisition of the heating plant, with respect to the tunnels and pipes that carried steam from the *95 heating plant to the various buildings that were being served. Steam was found to be escaping from the pipes and thus was not getting to the users for whom it was destined. Moreover, the meters which measured the amount of steam used by each building were found to be rusted and badly clogged with sand; and besides resulting in inaccurate readings, this condition also made prompt billing to the users a difficult matter, which was a source of annoyance to the users. Also, a new brick parapet was erected at the top of the building, on the front and both sides; and a new concrete porch-like platform was installed on the front, together with new concrete steps leading to the front door of the building. In about 1950, the Village of Mount Morris made a substantial increase in the charge for water furnished to users in Mount Morris, including the heating plant which converted large amounts of water into steam. In order to justify a resulting proposed increase in the rate for steam to be charged to the heating plant customers, petitioner, acting in his capacity as manager of the heating plant, retained the services of a certified public accountant to make an audit of the heating plants operations. *96 This audit revealed that unless a price increase was put into effect, substantial operating losses would be sustained. In the fall of 1950, petitioner attempted to put a rate increase into effect; but the customers refused to pay the same, and continued to pay at the lower rate which they had been paying. Not all members of the Pine Creek congregation were aware of their church's interest in the heating plant. However, many were so advised through announcements made by teachers at adult sessions of the Sunday School. These announcements in the beginning revealed an expectation that the church would benefit from profits hoped to be derived; but later, as profits failed to materialize, the announcements reflected the worsening condition. Also, the accountant who performed the above-mentioned audit was invited to and did attend a church congregation meeting at about Christmas 1950, for the previously announced purpose of answering any questions that members of the congregation might have regarding the heating plant operations. The operation of the heating plant was not financially successful. Beginning in late 1950 and continuing into 1951, the customers of the heating plant installed *97 heating systems of their own in their buildings; and they then discontinued obtaining steam from the heating plant. The operation of the heating plant was terminated sometime in 1951. As a result, the anticipated improvements to the church's properties were not made; and the contemplated project for distribution of children's religious educational material was not carried out. From 1947 and continuing through 1950 and 1951, petitioner acted as manager of the heating plant for the Pine Creek church. Bills for steam furnished to the users were sent out under the name of Kable Square Heating Plant. Checks from the users were received by petitioner and endorsed "Kable Square Heating Plant, by Nelson H. Rittenhouse, Manager." Petitioner also signed heating plant checks in payment of heating plant costs and expenses, under the name of "Kable Square Heating Plant, N. H. Rittenhouse, Manager." Petitioner and his wife did not reflect any of the heating plant income or expenses on their income tax returns for either of the years 1950 or 1951. The respondent however, in his statutory notice of deficiency herein, determined that petitioner was chargeable with income from the heating plant *98 for each of said years - such alleged income being computed as the difference between the asserted gross income of the heating plant reflected by the heating plant's bank deposits, and a portion of its expenses paid by check. Respondent did not allow any deduction for depreciation; nor did he make allowance for any loss sustained upon the termination of the heating plant's operations, either for the year 1951 when such termination occurred, or for the year 1950 by way of carryback. Finding of Ultimate Fact The Kable Square Heating Plant was not owned by petitioner Nelson H. Rittenhouse, during either of the years 1950 or 1951; but rather, it was owned during said years by the Pine Creek Church of the Brethren. Said petitioner served only as manager of the heating plant for said church. Any net income that might have resulted from operation of the heating plant belonged to the Pine Creek church and not to the petitioner. None of said net income, if any there was, is includable in petitioner's income for either of the years 1950 or 1951. Issue 1 - Opinion This issue presents the question: Who was the owner of the Kable Square Heating Plant during the years 1950 and 1951 - was *99 it the Pine Creek Church of the Brethren (as petitioner contends), or was it petitioner Nelson Rittenhouse (as respondent contends)? If the heating plant was owned by the Pine Creek church, then any income resulting from its operation would belong to the church; and it would be improper to include, as the respondent has done, the same in petitioner's income and charge him with Federal income tax with respect thereto. There was a welter of testimony on this largely factual point of the ownership of the heating plant. Suffice it to say, without making a detailed review of such evidence, that after seeing the witnesses and listening carefully to their testimony and after weighing and considering all the pertinent evidence, we are convinced that the Pine Creek church was the owner of the heating plant and entitled to the income therefrom, if any there was; and that petitioner was merely the manager of the heating plant for this small, rural, strife-wracked congregation of simple country folk. Our foregoing finding of ultimate fact reflects our said convictions. It is true that petitioner did not always handle the receipts from the heating plant customers in the most careful manner, *100 for the evidence establishes that these funds were sometimes commingled with his own. But this is to be explained, we think, by the necessity for petitioner to advance moneys of his own from time to time to keep the heating plant going, to defray the capital costs of improvements to the heating plant building, and to make repairs to the badly deteriorated steam lines. We have considered and weighed this aspect of the case as carefully as we can; and we are convinced that the evidence which tends to establish that the church was the owner of the heating plant, preponderates. We hold, in accordance with our finding of ultimate fact, that petitioner is not chargeable with any net income of the heating plant for either of the years 1950 or 1951. We add that we have the gravest doubts that there actually was any net income realized from the heating plant operations during said years. We are convinced that the net incomes determined by the respondent through use of his bank deposits analysis - in round figures, $1,700 in 1950, and $28,500 in 1951 - are not correct; for said amounts do not reflect the depreciation of the heating plant building and equipment for either year, nor do they *101 reflect allowance for any loss sustained on the termination of the heating plant's operation in 1951. In addition, accountant Anders Stortroen, who in 1950 conducted an audit of the heating plant's operations up through at least 1949 (and with whose candor and competence the Court was strongly impressed) advised the heating plant manager that unless the plant charged its customers an increased rate for the steam furnished them, it would lose money. However, such increased rate could not be, and never was, put into effect; but instead beginning in late 1950, the heating plant customers began to install heating systems of their own and to discontinue their patronage of the heating plant. In the light of all these circumstances, we find it difficult to believe that the heating plant operations resulted in a profit for either 1950 or 1951. We decide this first issue in favor of the petitioners. Issue 2 - Re Kable Brothers Transport Findings of Fact Throughout the taxable years involved petitioner's principal activity was the operation, as a sole proprietor, of a comparatively small trucking business known as Kable Brothers Transport (hereinafter called "KBT"). [2] Petitioner had *102 organized his proprietorship in the mid-1930's and throughout the taxable years involved, KBT operated as a common carrier of motor freight, subject to the jurisdiction of the United States Interstate Commerce Commission in matters of rates and tariffs. The largest business enterprise in Mount Morris was a corporation known as Kable Printing Company, which printed magazines, catalogs and like materials for various publishers. There also were several business houses in Mount Morris that more or less depended upon the Kable Printing Company - businesses whose function was to distribute the magazines that Kable Printing Company printed. KBT's business, in turn, revolved principally around the Kable Printing Company complex - i.e., KBT carried the printed finished products from Mount Morris to Chicago; and it brought back to Mount Morris, the paper, ink and other supplies necessary for the printing and distribution of the printed products. KBT was "certificated" by the I.C.C. to operate *103 between Mount Morris and Chicago, about 100 miles to the east. As regards outbound freight, this would be loaded on KBT's equipment at Mount Morris and then taken to Chicago. KBT maintained no terminal facilities of its own in Chicago; and so the outbound freight (if it was destined for points beyond Chicago, as was usually the case) was taken to the Chicago terminals of other carriers who were certificated to come into (but not to go beyond) the Chicago metropolitan area. These latter carriers, called "connecting carriers," took over the freight from KBT and transported it (sometimes utilizing other connecting carriers) to the consignees at widely scattered ultimate destinations outside Illinois. As regards inbound freight (freight being brought into Mount Morris for Kable Printing Company and related enterprises, KBT might in some instances be a connecting carrier for the last leg of a shipment that originated beyond Chicago; or it might in other instances be the only carrier involved on a shipment which originated in Chicago and terminated in Mount Morris. KBT was not one of the larger motor carriers. In terms of equipment employed, it had during the years involved only 4 to *104 6 truck-tractors and an equal number of trailers in which the freight was carried. Its Mount Morris terminal was situated in the rear of the above-mentioned heating plant. In 1950 and 1951, its office was in a room of the heating plant building; but in 1952, the office was in petitioner's home on West Main Street in Mount Morris. Freight bills were issued by KBT with respect to outbound freight - in some instances to the shipper concerns in Mount Morris, and in other instances to the consignees. In either case the amount billed would include the shipping charges for the entire haul (both for the portion handled by KBT and also for the portion or portions handled by the connecting carrier or carriers), plus the Federal excise tax on the transportation of property imposed under section 3475 of the 1939 Code. [3] As regards inbound freight, if KBT was a connecting carrier (as above described), its freight bill would be issued to the carrier from whom it had received the goods, and would include no excise tax; but if KBT was the only carrier involved, the freight bill would be issued either to the consignee or to the shipper, and would include excise tax. *105 Petitioner maintained two bank accounts in connection with his KBT proprietorship. One of these, in the name of "Kable Brothers Transport," was in the Ogle County National Bank at Oregon, Illinois. (Oregon is the county seat of the county in which Mount Morris is located, and it lies approximately 6 miles east of Mount Morris.) The Ogle County Bank account was used exclusively for making interline payments to connecting carriers for their shares of the freight payments received by KBT. The other KBT bank account was in the Citizens State Bank at Mount Morris, in the name of "N. H. Rittenhouse d/b/a Kable Brothers Transport." This account at Citizens State Bank was used chiefly for making disbursements on behalf of KBT (other than the interline payments to connecting carriers); and all KBT expenditures by check (with the exception of said interline payments) were made from this account. In addition to the above-mentioned accounts, petitioner had a checking account in his own name at the Illinois National Bank and Trust Company at the nearby town of Rockford, Illinois. This account had been opened many years earlier in 1940, in connection with some work he was then doing for a business *106 concern named "Werner Transportation Co." The Illinois National account was relatively inactive during the taxable years involved, with only 3 deposits (totaling $1,500) in 1950; 1 deposit (of $1,500) in 1951; and 4 deposits (totaling $10,384.30) in 1952. Also petitioner and his wife maintained a personal joint checking account at the above-mentioned Citizens State Bank; and the wife also maintained a personal individual checking account in the same bank. When checks in payment of freight bills were received at the KBT office, one of KBT's clerical employees would mark the invoices related thereto, "paid." Petitioner would then dispose of these checks in the following manner. He would take a check or a group of checks to one of the above-described banks, where he sometimes would take a small part of the proceeds in cash, sometimes would purchase bank drafts or cashiers' checks with a portion, and would deposit the balance. The dollar amount of the checks so received would include not only the amounts charged for the freight services performed by KBT, but also the amounts charged for the services of any connecting carrier or carriers, and the amount of any Federal excise tax involved. *107 The bank drafts and cashiers' checks purchased by petitioner were held by him for varying periods of time. Ultimately, he would deposit them in whatever bank account required funds, or he would cash the same and use the proceeds for business or personal purposes. In instances where KBT was the originating carrier and had collected freight charges that included amounts allocable to the services of a connecting carrier or carriers, petitioner would settle with the connecting carriers once each month in the normal and usual course of affairs. Occasionally, one of such connecting carriers might owe KBT money for the latter's services as a connecting carrier (in an inbound freight situation); and petitioner would sometimes delay payment to the connecting carrier until the latter's obligation to KBT had been satisfied. With regard to the business records maintained by KBT during the taxable years, these consisted of copies of freight bills issued by KBT; cancelled checks; and notes on a desk diary showing amounts of cash expended for KBT's purposes. The freight bills (which were marked "paid" upon receipt of checks in payment, as above found as a fact) were kept in file folders, by *108 customer and month - e.g., a particular file folder would contain all of the freight bills issued by KBT to Kable Printing Company for a particular month. This system was necessitated by the nontax reporting requirements imposed by the I.C.C. which called for the total amounts billed (but not necessarily collected) during each month. At the end of each year, petitioner's employees would go through all of the file folders for that year, plus the file folders for the last 2 or 3 months of the preceding year to determine the amount of freight charges that had been collected during the year. This step was necessitated by petitioner's practice of reporting with respect to his KBT proprietorship for Federal income tax purposes on the cash receipts and disbursements basis. The proprietorship's clerical employees would also in this connection, run an adding machine tape for each file folder, showing the amount of KBT's share of the total freight charges collected (but not the amounts of the interline payments due connecting carriers, or the amounts of the Federal excise taxes). The data on these tapes was then summarized for the yearly total; and this total was the amount of gross income which *109 was reported on the Schedule C for KBT, on petitioner's Federal income tax return for the particular year involved. Most of KBT's expenses (other than its non-cash expense of depreciation) were paid by check drawn on the KBT account at the Citizens State Bank at Mount Morris. It was necessary, however, for some of the expenses to be paid in cash. These cashpaid items were chiefly for petitioner's expenses in traveling to Chicago to confer with connecting carriers respecting freight shipments; for his expenses in traveling to various cities where he would confer with customers in the interest of maintaining good relations with them so as to retain their patronage; for making payments to the State of Illinois for licenses for the automotive equipment used in the proprietorship's business; and for paying various office expenses including such items as postage. Respondent's investigation of petitioners' income tax returns for the earlier years involved in the instant case, began in the fall of 1953. At that time, special agent Austin A. Mabrey (who was then employed in the Intelligence Division of the Internal Revenue Service in Rookford, Illinois) received a telephone call from a *110 tax informer. This person told Mabrey that if he would go to see a man named Brown in Oregon, Illinois, he would be furnished information regarding petitioner's tax affairs which might be of interest. Mabrey thereupon went to Oregon and talked with Brown, who gave him certain information regarding petitioner's operation of the trucking business in Mount Morris. Apparently, Brown also told Mabrey of petitioner's connection with the above-described Kable Square Heating Plant, for Mabrey shortly thereafter talked to various dissident members of the congregation of the Pine Creek church. Thereafter in the late fall of 1953, Mabrey sent a preliminary report regarding petitioner to his superiors in Chicago. Mabrey took no further action in this matter until some time in 1955, when Chicago officials of the Internal Revenue Service determined that a formal investigation should be undertaken - apparently for the years 1950, 1951 and 1952. Mabrey was assigned to make this investigation; and he was given the assistance of a revenue agent, Ray Vander Linden. Mabrey took as his sphere of responsibility, the ascertainment of the petitioner's gross income; while Vander Linden (in addition to helping *111 with Mabrey's portion of the investigation) was given primary responsibility for dealing with deductions and computations of tax liabilities. Mabrey utilized a bank deposits method for ascertaining what he then conceived to be the petitioner's gross income. He went to various banks were petitioner and his wife had accounts, both personal and business; and he there examined the bank's ledger sheets, deposit tickets, and photostats of certain checks that were deposited or negotiated by one or the other of the petitioners. After eliminating various nonincome items from the total deposits (such as proceeds of loans and transfers between accounts) Mabrey arrived at certain amounts which he treated as being the gross income of petitioner for the years here involved. These amounts obtained from the bank deposits, included: (1) Receipts of the Kable Square Heating Plant from furnishing steam to customers; (2) receipts of petitioner in his operation of KBT, which represented both the portions of the total freight charges to which KBT was entitled, and also the remaining portions of such charges which were attributable to the services of connecting carriers, and which petitioner was obligated *112 to and did pay over to such connecting carriers; and (3) receipts of petitioner representing Federal excise taxes on total freight charges, imposed under the above-cited section 3475 of the 1939 Code, which petitioner collected as an agent for the Government. As regards Vander Linden's phase of the investigation, he allowed in his revenue agent's report, all the deductions (including those paid in cash, that were later disallowed in respondent's deficiency notice) which had been claimed in Schedule C for KBT, on petitioners' income tax returns; and in addition, he allowed deductions for the following items which had not been claimed in said returns: (1) A portion of the expenses of the Kable Square Heating Plant which were paid by check; and (2) the amounts of all checks written on the Ogle County Bank account of KBT, for payments to interline connecting carriers. During the earlier stages of the abovementioned investigation, the matter had been considered by the investigating agents as one for possible criminal prosecution of petitioner for tax evasion; and Mabrey, in one of the reports to his superiors, recommended prosecution for the year 1952 alone. Thereafter, following a *113 conference in Aurora between petitioner, his accountant, his then attorney, and representatives of the Internal Revenue Service, the Service decided against any criminal prosecution being undertaken; but subsequently it decided to proceed civilly. Petitioner, in late 1959 or early 1960, went to Chicago to confer regarding said proposed civil proceeding, with a man named Ferber who was a technical advisor in the Appellate Division of the Internal Revenue Service. Petitioner brought with him a computation of the income of KBT, which had been prepared by his accountant Stortroen from an analysis of the freight bills issued by KBT. Ferber had before him at that time, a so-called 10-day letter in which one of the revenue agents had recommended that substantial deficiencies and additions to tax be determined against petitioner for each of the years 1950, 1951 and 1952. During the course of said conference, Ferber questioned petitioner closely with respect to the KBT trucking business (particularly concerning the extent of the business, the number of trucks used, the number of drivers employed, and the fact that KBT was subject to the jurisdiction of the I.C.C. in the matters of rates and *114 tariffs); and Ferber then stated that, based on his experience as a former auditor for the I.C.C., he believed it would not have been possible for petitioner to have earned the amounts of income that were set forth in the 10-day letter. Ferber thereupon requested petitioner to have his accountant make an income determination for KBT, based on a bank deposits analysis; and for petitioner to bring such accountant's report back to Ferber, at which time he (Ferber) believed the case could be settled. Accountant Stortroen prepared such an analysis; and then he and petitioner went to Chicago to confer with Ferber. Upon arrival, they found that Ferber had died, and that his funeral was that very day being held. Thereafter in October 1960, Stortroen's analysis was presented by petitioner to the technical advisor to whom the case had been assigned following Ferber's death. No further conferences were had between petitioner and/or his representatives, and representatives of the Internal Revenue Service, until preparations had been commenced for trial of the instant case. The following table shows the gross income of petitioner's KBT trucking business, as computed by Stortroen from a bank *115 deposits analysis for the years 1950, 1951, and 1952: 1950
Gross deposits
$171,670.94
Less: Interline amounts for
$76,731.23
$63,502.21
connecting carriers
Federal excise taxes collected
4,438.83
81,170.06
4,368.71
Gross Income
$ 90,500.83
1951
1952
Gross deposits
$157,994.56
$194,544.10
Less: Interline amounts for
$80,081.82
connecting carriers
Federal excise taxes collected
67,870.92
4,414.75
84,496.57
Gross Income
$ 90,123.64
$110,047.53 We find as an ultimate fact that petitioner's gross incomes from his proprietorship, Kable Brothers Transport, for the years 1950, 1951, and 1952, are the amounts appearing in the foregoing table. We further find as an ultimate fact, based on our consideration and weighing of all the pertinent evidence, that the allowable deductible expenses of petitioner's KBT trucking business for each of the years 1950, 1951, and 1952, are as follows: 1950
1951
1952
Expenses paid by check (plus certain
cash-paid expenses initially
disallowed by respondent in his notice of
deficiency, but later
conceded by him to be allowable
$65,509.70
$60,515.32
$70,807.52
deductions in the First Supplemental
Stipulation of Facts)
Expenses paid in cash
5,106.50
5,956.00
5,000.00
Depreciation
$ 8,966.39
$ 9,018.61
$ 9,111.81
Total
$79,582.59
$75,489.93
$84,919.33
*116 The following tabulation is a summary of Schedule C for the KBT proprietorship, included in petitioner's return for each of the years 1950, 1951, and 1952: 1950
1951
1952
Gross Income
$88,910.62
$85,043.74
$95,583.60
Deductions: Materials and supplies
$16,204.88
$14,537.99
$14,326.58
Salaries and wages
30,560.66
23,355.51
31,054.00
Interest
65.00
65.00
Taxes
5,443.17
4,761.06
5,173.44
Depreciation
5,994.44
5,506.56
5,511.98
Repairs
5,213.23
7,380.97
8,981.96
Other business expenses
21,091.78
24,629.72
25,274.40
Total Deductions
$84,573.16
$80,236.81
$90,322.36
Net Profit
$ 4,337.46
$ 4,806.93
$ 5,261.24 The gross incomes shown in the above tabulation represents petitioner's share only, of the amounts received by KBT for carrying freight; and they were computed by clerical employees in the office of KBT from freight bills which it issued. The deductions for taxes include the amounts of Federal excise taxes collected as part of said freight bills ($4,438.83 for 1950; $4,368.71 for 1951; and $4,414.75 for 1952), which taxes are not a proper deduction and should not have been claimed. However such taxes, although erroneously *117 included, were not fraudulently included by the aforementioned clerical employees in the computations of total taxes paid by KBT, which said employees furnished to petitioner and which he then used in preparing the Schedules C of his returns. Petitioner's KBT trucking business increased sharply in 1952, over what it had been in previous years; and petitioner was compelled to devote an increased amount of time to seeing that freight shipments were properly handled. At this same time, some of his clerical employees resigned and had to be replaced by new and inexperienced employees. Also, petitioner was considerably worried and depressed during 1952, by the failure in the previous year of the Kable Square Heating Plant, which the Pine Creek church owned and which petitioner had hoped would become a source of revenue for said church. The respondent, in his statutory notice of deficiency herein which was mailed on December 28, 1960 (over 9 1/2 years after the 1950 return had been filed), determined that petitioner had derived additional business income from all sources, in the amounts of: $57,447.06 for 1950; $51,779.70 for 1951; and $34,703.22 for 1952. Said determination was based *118 on the above-mentioned bank deposits analysis of special agent Mabrey and revenue agent Vander Linden; and for the years 1950 and 1951, it included gross receipts of the Kable Square Heating Plant - which we have decided, under Issue 1 hereinabove, did not belong to petitioner and are not includable in his income. Also, the amounts which the respondent determined to be gross income for the years 1950 through 1952, included amounts received by petitioner which were attributable to services performed by connecting carriers; and they included also Federal excise taxes collected by petitioner as agent for the Government. Moreover the respondent, in his determination, disallowed all expenses of KBT (exclusive of depreciation) which had not been paid by check, including the cash-paid items which Vander Linden had allowed in his computation. Finding of Ultimate Fact The correct net income of petitioner's KBT trucking business for each of the years 1950, 1951, and 1952, is: 1950
$10,918.29
1951
14,633.71
1952
25,128.20
Issue 2 - Opinion The second issue requires that we ascertain the correct net income of petitioner's KBT trucking business proprietorship for *119 each of the years 1950, 1951, and 1952. To make such ascertainment, it has been necessary for us to make from the evidence, what is for all practical purposes an audit with respect to KBT's operations for said 3 years which are now long past. The task has been an onerous one, necessitating a consideration of hundreds of pages of testimony and over 150 exhibits. The computation of the net income of KBT for each of the 3 years involves, of course, first ascertaining the gross income; then ascertaining the allowable deductions; and finally subtracting the deductions from the gross income to arrive at the net income. The only records kept by the petitioner from which the gross income of KBT may be ascertained, are copies of the freight bills issued by said proprietorship. If all of these freight bills had been available to us, they would have been the best evidence of said proprietorship's gross income; for on each bill there would have been separately stated the exact amount of: (1) The total amount of the freight charges; (2) the portion thereof attributable to KBT for its services; (3) the portion attributable to the connecting carriers for their services; and (4) the portion representing *120 the Federal excise tax on the shipment. But no one could be sure that all the freight bills were accounted for - that is to say, there was no assurance that some of them might not have been misplaced or lost (there has been no contention that any were purposely destroyed). In this circumstance, it was necessary for respondent to resort to some third party's records for ascertainment of the gross income of the proprietorship; and the respondent elected to employ a bank deposits analysis method, and to utilize the third-party bank's records. We recognize that the instant case is a proper one for use of a bank deposits method; but we feel impelled to conclude that the respondent has not properly applied that method in the instant case; for that which he determined to be gross income actually constituted gross receipts. These gross receipts used by respondent included the connecting carriers' shares of the freight charges, and also all Federal excise taxes collected by KBT - neither of which items is includable in petitioner's gross income. Still another error in the respondent's application of the bank deposits method is that he treated as part of petitioner's gross income, all receipts *121 of the Kable Square Heating Plant - which we have held under Issue 1, did not belong to petitioner and are not chargeable to him. At the trial herein, accountant Stortroen appeared as a witness for the petitioner, and he presented a computation of KBT's gross income for the years involved which likewise is based on use of a bank deposits method. In the exhibits which he presented during the course of his testimony, he started with approximately the same gross receipts as respondent had used in his computation; but he then eliminated therefrom all identifiable nontaxable items, including the Kable Square Heating Plant income, the connecting carriers' shares of freight charges, and the Federal excise taxes. He thereby arrived at the following amounts of gross income for the KBT business which we have hereinabove set forth in our Findings of Fact: 1950
$ 90,500.88
1951
90,123.64
1952
110,047.53 After considering Stortroen's computations as set forth in his exhibits and also his testimony in respect thereto, we are convinced that these computations represent the best evidence in this record of KBT's gross income. Stortroen's bank deposits analysis, like any such *122 analysis, is subject to the possible weakness that some of the deposits included, which are not clearly identifiable as to character, may actually be nonincome items that should have been excluded. Errors of this character in Stortroen's analysis, if any, redound to the benefit of respondent. Turning next to the deductions aspect of this issue, we have allowed in the first instance: (1) All the deductions respecting KBT which the respondent allowed in his notice of deficiency - being the items which were claimed on petitioner's returns and which were substantiated by canceled checks (subject to one exception, which is the disallowance by us of the Federal excise taxes deducted on said returns); and (2) all the additional deductions which respondent conceded in the First Supplemental Stipulation of Facts to be deductible. The totals of all these deductions which we have so allowed, are: 1950
$65,509.70
1951
60,515.32
1952
70,807.52 In addition, we have allowed the following deductions for cash-paid expenses which were claimed on petitioner's returns: [4]
1950
1951
1952
Licenses for automotive vehicles
$1,106.50
$1,456
Travel expenses of petitioner to Chicago to confer
1,900.00
2,100
$2,400
with carriers regarding freight shipments
"Advertising" expenses representing travel by
1,600.00
1,800
2,100
petitioner in calling upon shippers to maintain
good customer relationships
Miscellaneous office expenses
500.00
600
500
Total cash-paid items allowed
$5,106.50
$5,956
$5,000
*123 We also have allowed deductions for depreciation of KBT's equipment, as follows: 1950
$8,966.39
1951
9,018.61
1952
9,111.31 These amounts are based on a carefully prepared depreciation schedule worked out by accountant Stortroen (with which we were favorably impressed); and they are somewhat larger than the amounts claimed for depreciation on petitioner's returns, due to the omission there of certain new items of equipment acquired during the taxable years. These omissions were pointed out during the testimony of Stortroen and petitioner; and respondent did not voice objection thereto. In the light of all the foregoing, *124 we have hereinbefore found as an ultimate fact, what in our best judgment is the correct net income of KBT for each of the years 1950, 1951, and 1952. These amounts are: 1950
$10,918.29
1951
14,633.71
1952
25,128.20 We here hold that said amounts of net income are the correct amounts of the net incomes of KBT for said years. Issue 3 - Re Additions to Tax for Fraud Findings of Fact All the evidentiary facts respecting this issue are embodied in our Findings of Fact regarding Issues 1 and 2, hereinabove. Finding of Ultimate Fact No part of the deficiency for any of the years 1950, 1951 or 1952 is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. Issue 3 - Opinion The respondent has determined that petitioner is liable for an addition to tax for fraud for each of the above 3 years, under section 293(b) of the 1939 Code. That section provides that if any part of a deficiency for any year is due to fraud with intent to exade tax, then the taxpayer is liable for an addition to tax in an amount equal to 50 percent of the deficiency. Section 1112 of said Code places the burden upon the Government to prove fraud *125 in every case where fraud is an issue. This Court and others have held in cases too numerous to cite, that fraud is never to be presumed but must be proved by clear and convincing evidence. A comparison between the correct net income of petitioner's KBT trucking business proprietorship as found in our ultimate finding of fact on Issue 2 (this being his only source of income during the years here involved, by reason of our holding on Issue 1 - that the net income of Kable Square Heating Plant, if any there was, is not taxable to petitioner) with the KBT net income reported by petitioner on Schedule C of his returns, does reveal an understatement of such business income on petitioner's return for each of the years involved. But we are convinced that the resultant deficiency in tax for each of these years is not due to fraud. This conviction, which is in petitioner's favor, is the basis of our finding of ultimate fact on this third issue. We are persuaded that the deficiency in each year is traceable to: (1) Inadequate books of account; (2) inefficiency on the part of the clerical employees who maintained KBT's records - an inefficiency which was magnified in 1952 (the year of the *126 largest understatement) by the bringing in of new and inexperienced help; (3) understandable errors which crept in when the clerical employees had to pick out from the freight bills that were maintained on an accrual basis to satisfy the Interstate Commerce Commission, the cash collected on these freight bills in order to reflect petitioner's taxable income on the cash receipts basis; and (4) the erroneous deduction of the Federal excise taxes, as to which petitioner was merely a collecting agent for the Government. Respondent has failed to convince us that any of the foregoing factors were due to fraud with intent to evade tax. We hold, in accordance with our finding of ultimate fact, that no part of the deficiency for any of the years 1950, 1951 or 1952 is due to fraud with intent to evade tax. We decide this issue for the petitioner. Issue 4 - Re Statute of Limitations Findings of Fact Petitioner and his wife executed waivers extending to December 31, 1960, the time for assessment and collection of any income tax for 1952. The deficiency notice (which included said year) was mailed within said period, on December 28, 1960. No waiver was executed by said petitioners for *127 either of the years 1950 and 1951. The returns for these years were filed in March 1951 and March 1952, respectively. The deficiency notice which covers said years, was mailed on December 28, 1960 - a date that was more than 8 years after the filing of the return for each of said years. All other evidentiary facts respecting this issue are embodied in the Findings of Fact regarding Issues 1 and 2 hereinabove. Finding of Ultimate Fact The joint returns filed by petitioner and his wife for the years 1950 and 1951 are not false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the 1939 Code. Assessment and collection of any deficiency or addition to tax for either of said years are barred by the statute of limitations. Issue 4 - Opinion As regards the year 1952, assessment and collection of the deficiency for said year (the exact amount of which will be computed by the parties under Rule 50) are not barred by the statute of limitations, for that year is still open as the result of the abovementioned waivers executed by the petitioners. We point out however, that as a result of our holding on the third issue, petitioners are not liable for any *128 addition to tax for said year. As regards the years 1950 and 1951, assessment and collection of a tax for either of these years would be freed from any limitation only if the return for the par ticular year is false or fraudulent with in tent to evade tax. For the reasons stated in our discussion of Issue 3 - relating to additions to tax for fraud - we hold in accordance with our finding of ultimate fact, that neither of the returns for 1950 and 1951 is false or fraudulent with intent to evade tax. Rather, we are fully convinced that when each of these returns was filed, petitioners believed (albeit erroneously) that their full Federal income tax liability was shown thereon. We hold that as regards each of the years 1950 and 1951, assessment and collection of any deficiency for either of these years are barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
1. The Annual Conference was apparently akin to a national convention, at which representatives from the various geographical district of that denomination gathered to attend to matters of general concern.↩
2. Petitioner's said proprietorship was unrelated to the previously mentioned corporation, Kable Brothers Company. In 1948 or 1949, that corporation's name was changed to Kable Printing Company.↩
3. Section 3475 provided in substance that when a carrier billed a customer for freight charges, the carrier was required at the same time to collect the excise tax, and then to remit the same to the Internal Revenue Service.↩
4. The amounts for cash-paid automotive licenses were claimed on the returns and have been allowed in full. No similar amount for 1952 has been here allowed, because such amount was apparently included in the checksubstantiated items which were allowed by respondent, and which we similarly have allowed. As regards all other cash-paid expenses listed, we have fixed the amounts shown as allowable by estimate after consideration of all the pertinent evidence, in reliance upon the principle of .↩